# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES DERRICK KELLER,

        Plaintiff,

        v.

J.S. WALTON, *et al.*,

        Defendants.

Case No. 3:16-cv-00565-JPG-GCS

## MEMORANDUM AND ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

Plaintiff Charles Derrick Keller wants to choose which federal prison he is incarcerated in. He also does not want a cellmate. So when the defendants—officials working for the Federal Bureau of Prisons (BOP)—assigned Keller a cellmate and later transferred him to a different institution, Keller sued them. Keller suffers from serious mental health issues—nobody here disputes that—and he argues that the defendants' conduct was deliberately indifferent to those medical needs in violation of the Eighth Amendment's Cruel and Unusual Punishment Clause. While the Court found that Keller sufficiently stated such a medical claim at the motion to dismiss stage, his case does not survive the defendants' motion for summary judgment. (ECF Nos. 157, 167.)

## I.    BACKGROUND

Keller received a 180-month sentence in 2007 for illegally possessing a firearm as a convicted felon. He began his incarceration at a few different prisons, but in 2009, the BOP transferred him to USP Marion in southern Illinois for a few reasons—including its security level and because his family lived in the area. The BOP later transferred Keller to FCC Coleman in 2014, followed by subsequent transfers to FCI Gilmer and FCI Memphis. All the while, the BOP

1

provided extensive treatment for Keller's ADHD, bipolar disorder, and potentially borderline personality disorder—including hundreds of clinical encounters and nine different psychotropic medications.

Keller does not complain about any of that treatment. Instead, he says that for several years at USP Marion, the BOP provided him with another form of treatment: at times, he got an entire cell to himself instead of having a cellmate. Keller alleges that this was a form of treatment because a BOP Program Statement says that "[d]ue to their potential vulnerability in a correction setting, inmates with mental illness may require special accommodation in areas such as housing . . . ." (ECF No. 166-3, p. 13.) So when BOP officials later transferred Keller to FCC Coleman in 2014—where he then had a cellmate—he sued, arguing that the revocation of his single-cell treatment constituted deliberate indifference to his medical needs.

The uncontroverted record, however, does not support Keller's allegations. When Keller first arrived at USP Marion in 2009, Dr. Patterson held an intervention session with him because Keller complained that his new cell mate "is known homosexual who 'has a crush on me.'" (ECF No. 166-6.) Dr. Patterson then recorded: "Given Keller's history and anticipated difficulty of finding a cellmate that can tolerate Keller's level of energy and anxiety, it was recommended he be assigned a single cell." (*Id.*) Dr. Patterson has made clear, however, that single-cell status is not a "treatment." (Patterson Dep. 69:19–70:7, ECF No. 157-2.)

Things are then relatively quiet for two years, but later, BOP records state that:

> KELLER reported receiving an incident report for receiving money and was concerned about being moved from his current unit. We discussed the importance of following rules and consequences. KELLER was reminded of his history of responding to the power of positive thinking and encouraged focus on this at this time. He agreed to make the effort. Keller denied any current thoughts of self-harm. There was no indication of hallucinations or delusions. Speech was rambling, thoughts tangential, but could be brought back on task easily. Psychomotor agitation was evident, legs shaking, fidgeting in seat. Follow-up will

occur to assess response to medication increase. In addition, his housing assignment will be discussed with the unit team.

(ECF No. 166-7.)

The issue blows up a few months later. Keller gets in trouble for possessing a weapon and other contraband, assault, running a gambling pool, and coercing other inmates to allow him to use their phone accounts in violation of his phone restrictions. " (ECF No. 166-10.) BOP records then note that Keller "lost his preferred housing status, but he has refused to move and was recently placed in the Special Housing Unit. Keller has tried to manipulate staff in believing he can only function in a single cell. As a result, this has created an atmosphere of animosity and has made it difficult to appropriately manage the preferred housing units." (*Id.*) The same record later states that Keller's "continued inability to follow the rules and regulations of the institution has significantly contributed to staff's ability to maintain the secure and orderly running of the institution." (*Id.*)

When Keller gets out of the SHU and back into the general population, he gets a cellmate. But the BOP records note that this led to several outbursts by Keller, so they gave him a single cell again. Then about a month later, when an incident report was not resolved to Keller's liking, he "isolate[ed] himself in his cell, using a sheet to block the view and avoiding all staff and most inmates . . . ."

The BOP later puts Keller in the SHU again because he told staff during pill line: "I am going to fuck all of you up." That led to the following email by Dr. Patterson:

Hey, you offered, so I'm asking. Marion has two inmates that we really need to transfer. I just not sure, where and how…

KELLER, Charles 06822-025 This one is more challenging due to criminal behavior patterns. He is a high security inmate (small stature looks younger than his age) who we have had at Marion since 2009. **He has burned his bridge here and is being put in for transfer to a USP.** Between 2007 and 2009 he was at

three different USP's, one that resulted in a serious assault on him. He has a history of being diagnosed with a bipolar mood disorder-manic, and substance abuse. In addition to the assault mentioned, he was caught up at a riot at a State facility. Keller claims he is ADHD, I think that is a more accurate dx. There are also several behaviors consistent with PTSD. He was transferred to us from Coleman with an off formulary amphetamine medication. He was placed on that after three years of being out of control and going through every other medication. When he arrived, our medical staff discontinued the medication and, OMG, he definitely functions better on it. It took a minute, but we got him back on. When he is not on medication, our conversations are tangential and he can't sit still, touching and fiddling with everything on my desk. When on meds, he can focus on one topic during a session. However, even when on the medication, he is: fidgety with poor boundaries, when even mildly challenged he talks excessively, blurts out inappropriately and cannot wait his turn. He has insight to this, knows he is obnoxious so he isolates himself to avoid problems with others. The reason, and only reason he has done well here, is we have single cell housing. He puts up his curtain and stays in his cell as much as possible. He only comes to mainline occasionally, never goes out to rec. We did have to place him in a two man cell for a while and every cell mate he had was begging to be moved. His issue here is his gambling...he believes he has some special gift for picking teams and is always running a ticket. The unit team is done with him. **When he transfers, he is going to require a lot of assistance if he is going to function on a compound.** Thoughts?

(ECF No. 166-9.)

While those discussions were ongoing, Keller asked one of the BOP officials that they re-assign Keller to a single-man cell once he gets out of the SHU. The BOP declined, and on May 22, 2014, they told Keller that they would release him from the SHU and place him in a three-man cell. The BOP also put in a transfer request for Keller to a different institution, which reads:

Inmate Keller arrived at USP Marion from USP Coleman on November 4, 2009, for Lesser Security purposes. Since his arrival, he has had one high and ten moderate level incident reports. He was initially placed in SHU for disciplinary purposes. The incident involved Keller stating "I am going to fuck all of you up," to staff during pill line. The DHO subsequently dropped a threatening bodily harm to staff charge and he was found guilty of insolence. He remains in SHU pending transfer. Keller previously coerced two other inmates to allow him to use their phone accounts after he had been placed on phone restriction. These inmates lost their preferred housing (single cell) as well as additional sanctions. **Keller also lost his preferred housing, but he refused to move. Psychology staff subsequently intercepted and Keller was allowed to remain in a single cell. This has created an atmosphere of animosity and has made it difficult to**

**appropriately manage the preferred housing units.** Keller has had several incident reports for possessing gambling paraphernalia and giving/accepting money without authorization. Keller has not participated in any educational or vocational programming as recommended by his unit team. Overall, his adjustment has been poor.

Highlighted in the Rational for Referral: "It should be noted that the Mental Health Treatment Coordinator, Central office, recommended that the unit team submit a Care Level 3-Mental Health Transfer for him. Based on his incident report history, inability to program and mental health care level, the unit team recommends a transfer to any appropriate facility commensurate with his custody, security and treatment needs."

(ECF No. 166-5.) That request was accompanied by a "mental health transfer summary" by Dr. Patterson, which states:

KELLER is currently in SHU. He was placed in SHU on 4/23/2014 for being insolent to staff. Prior to this, KELLER was in preferred housing, a single cell. He is currently refusing to leave SHU as he will be required to move to a three man cell. Historically, KELLER has had a great deal of difficulty being house with other inmates. Typically the other inmates cannot tolerate him, due to hypervigilance, lack of flexibility, level of anxiety, level of energy, and intrusiveness (primarily verbally). He has been seriously assaulted at a USP previously.

(ECF No. 166-4.) So on July 1, 2014, the BOP transferred Keller to FCC Coleman: a "Mental Health Care Level 3" facility which provides enhanced outpatient and residential mental health care facilities compared to USP Marion, which maxes out at Level 2. (ECF No. 166-3, p. 8.) When Keller arrived at FCC Coleman, however, medical officials dropped him back to a level 2 and assigned him a cellmate.

The BOP transferred Keller again about a year later, this time to FCI Memphis—where he remained a level 2 designee. He requested single-cell status there as well, but psychology staff told him that "single cell status was not appropriate and was not a form of mental health treatment." (ECF No. 157-3, p. 3.) Keller also tried to convince them that he was so mentally ill that "he required isolation from others"—very much in-line with what the records from USP

Marion said as well—but psychology staff did not agree and told Keller that single-cell status was not an option for him. (*Id.*) That was especially because Keller's behaviors "exponentially increased his risk of suicide," so they did not want him alone in a cell. (*Id.*) Psychology staff also found that Keller's single-cell status at USP Marion appeared to be "to appease" Keller, and that "single cell status was not clinically indicated and was rather contraindicated given his claimed mental health problems and the clinical diagnoses given by the Psychologists." (*Id.* at pp. 4–5.)

Keller later sued 26 BOP officials at USP Marion for three alleged constitutional violations stemming from these incidents. Five defendants and one claim remain in the case: Keller says that they were deliberately indifferent to his medical needs in violation of the Eighth Amendment's Cruel and Unusual Punishment clause by giving him cellmates at USP Marion and transferring him away to a different institution. Those defendants moved for summary judgment (ECF No. 157, 167), and Magistrate Judge Gilbert C. Sison issued a Report and Recommendation advising this Court to deny the defendants' motion. (ECF No. 170.) The defendants have objected, so this Court has conducted a *de novo* review of the matter. Fed. R. Civ. P. 72(b)(3); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of

that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). When responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

**B.      Deliberate Indifference**

The Eighth Amendment's prohibition on the unnecessary and wanton infliction of pain forbids deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). To prevail on such an Eighth Amendment claim, a prisoner must show (1) that he had an objectively serious medical need, and (2) that the official knew that the medical need was serious and presented a substantial risk of harm, but disregarded it. *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Johnson*, 444 F.3d at 584.

An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson*, 444 F.3d at

585. The prisoner must show that the defendant's conduct was intentional or criminally reckless; neither simple nor gross negligence is sufficient to establish deliberate indifference. *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015); *Johnson,* 444 F.3d at 585; *Salazar v. City of Chi.,* 940 F.2d 233, 238 (7th Cir. 1991). Deliberate indifference can arise when a treatment decision was "blatantly inappropriate." *Greeno v. Daley,* 414 F.3d 645, 654 (7th Cir. 2005) (quoting *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996)). A "blatantly inappropriate" decision is one that is "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (internal citation omitted). Mere disagreement between a prisoner and his doctor, or even between two doctors, however, is not enough to establish deliberate indifference. *Id.*

## III. ANALYSIS

The record and motions in this case may be dense, but the analysis is not. All of the evidence in this case indicates that BOP medical officials provided consistent and thorough treatment for Keller's medical issues—but his single-cell accommodations were **not** part of Keller's treatment regimen. Dr. Patterson—Keller's psychologist at USP Marion—testified that she would not recommend single-cell accommodations as a "treatment." (Patterson Dep. 69:19–70:7, ECF No. 157-2.) And Dr. Buzzanga—Keller's psychologist at FCI Memphis—said that "single cell status was not clinically indicated and was rather contraindicated given [Keller's] claimed mental health problems and the clinical diagnoses given by the Psychologists." Dr. Buzzanga also said that USP Marion giving Keller a single-cell was rather intended to "appease" Keller—and that claim is consistent with every piece of evidence in the record.

The only person in this case arguing that Keller's single-cell accommodations were part of his treatment plan, and that Keller needed such a treatment, is Keller himself. That is clearly not enough to establish deliberate indifference: Keller's disagreement with the medical testimony in this case does not amount to an Eighth Amendment violation. *Pyles*, 771 F.3d at 409. And even though the BOP's policy statement says that single-cell status *may* be used as a treatment, that does not change the fact that all of the testimony in this case is that Keller's treating physicians did not use it as such. There is hardly anything more to say.

Finally, Keller also alleges that his transfer from USP Marion to FCC Coleman amounted to deliberate indifference to his medical needs as well. That argument strains credulity. Not only did FCC Coleman have *more* mental health treatment options available—which alone kills Keller's case—but Keller's argument would eviscerate the BOP's ability to make security-based administrative housing decisions. Keller's own treating psychologist noted that Keller had "burned his bridge" at USP Marion due to his numerous security incidents, including telling staff "I am going to fuck all of you up"—so of course the BOP, in its discretion, transferred him to a different facility where he could start fresh.

Allowing prisoners to sue the BOP because they do not want to move to a different prison—or because they want a cell all to themselves—is usually the type of allegation that 28 U.S.C. § 1915A screening orders sniff out and dismiss as frivolous. This case was an exception and proceeded to summary judgment because Keller—very eloquently at times—alleged that his single-cell status was part of a treatment plan. But now, the evidence simply does not support that allegation any manner.

## CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS** the MOTION for Summary Judgment on Count I of Plaintiff's Complaint by C Behle, J Byram, S Byram, J S Walton (ECF No. 157);

- **GRANTS** the MOTION to Dismiss for Failure to State a Claim or in the Alternative, Motion for Summary Judgment by all defendants (ECF No. 167);

- **REJECTS** the Report and Recommendation on those motions (ECF No. 170); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: JULY 8, 2019**

<u>**s/ *J. Phil Gilbert***</u>
**J. PHIL GILBERT**
**U.S. DISTRICT JUDGE**